**FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,**

v.

**Otis R. BOWEN, in his official capacity as Secretary of Health and Human Services, et al., Defendants.**

**Civ. A. No. 87–3393.**

United States District Court, District of Columbia.

Oct. 4, 1989.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Mark Pollot, Pauline M. Milius and Charles F. Findlay, Land & Natural Resources, Dept. of Justice, Washington, D.C., for defendants.

## OPINION AND ORDER

REVERCOMB, District Judge.

The plaintiffs have sued the chiefs of various federal government entities to enjoin the National Institute of Health (NIH) from supporting any research involving various aspects of genetic, AIDS, and cancer research until NIH completes an Environmental Impact Statement (EIS) on the research, pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. Oral argument was heard on February 28, 1989. In this Opinion and Order, the Court grants the defendants' motion for summary judgment.

### I. The Current Legal Standards

NEPA requires the federal government to create a "detailed" statement on all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Such a statement must discuss:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance abd enhacement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the propose action should it be implemented.

*Id.* Such statements are to be made available to the public, *id.*, and are designed to inform the governmental policy-makers and the public about the environmental effects of action undertaken with governmental support. *See* 40 C.F.R. § 1502.1 (Council on Environmental Quality regulations); *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1300 (8th Cir.1976).

Once an agency has completed an EIS on a major federal action, the agency must supplement the EIS if (1) the agency makes substantial changes to the action that changes the environmental impact, or (2) there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.09(c)(1) (regulations of the Council on Environmental Quality); *Friends of the River v. FERC,* 720 F.2d 93, 109 (D.C.Cir.1983) (approving the supplementation standard); *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 986 (5th Cir.1981).

There is no hard-and-fast rule regarding when there are significant enough new circumstances to require a new EIS. It is clear to the Court, however, that an agency should not have to generate an EIS every time a researcher develops a new project— such a requirement would be oppressively burdensome and would effectively prevent a tremendous amount of research from going forward. Rather, a supplementary EIS should be required when new developments have so increased the effects and risks to the environment that the old EIS does not

properly address them. It is safe to say, then, that a supplementary EIS should not be required when there are new developments in a field of research that scientists believe either have less effect than preceding research or that reveal that the field of research is likely to have less effect on the environment than originally estimated.

The NIH in 1976 published detailed Guidelines on NIH-sponsored rDNA research. The Guidelines set standards for safety and environmental protection in rDNA research, including physical containment of particular experiments, and discouraged certain experiments. They also established groups to review research and determine whether the Guidelines were being followed properly.

In 1977, NIH published the final draft of an EIS on the 1976 Guidelines after accepting public comments. 41 Fed.Reg. 38425 (1977). The statement evaluated the likely consequences of research under the Guidelines and concluded that although following the Guidelines would guard against many possible environmental harms, they would not and could not guarantee that rDNA research would be free from all risk. The EIS also stated that the Guidelines should remain flexible in order to take account of new biological developments and new evaluations of the environmental impact of certain research.

This Court upheld the adequacy of the 1977 EIS in a lawsuit to enjoin NIH-sponsored rDNA research. *Mack v. Califano*, 447 F.Supp. 668 (D.D.C.1978). Since *Mack*, NIH has published a number of smaller Environmental Assessments ("EA's") to supplement the 1977 EIS. An EA is a "concise public document" that provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement of a finding of no significant impact" and aids the agency's compliance with NEPA when a full EIS is not necessary. 40 C.F.R. § 1508.09(a); *see FOET v. Heckler*, 756 F.2d 143 (D.C.Cir. 1985). Like an EIS, an EA must include a discussion of the environmental impact of the topic, as well as alternatives to the action involved. *Id.* § 1508.09(b).

In the years after the formulation of 1976 Guidelines, the experts at NIH determined that the initial level of concern over the dangers of rDNA research was too high, and that some relaxation of the Guidelines was warranted. This conclusion was based on the fact that there had been little or no environmental harm caused by rDNA research and that additional research showed that rDNA did not pose the level of risk that was once feared. *See, e.g.,* Office of Technology Assessment, *New Developments in Biotechnology* 9 (1988). The Guidelines thus have been relaxed somewhat nearly each year since 1976, most recently in 1987. *See* 52 Fed. Reg. 31848–50 (Aug. 24, 1987). The defendants' position is that there is no need for a new EIS on the revised Guidelines because both the new scientific evidence and the excellent environmental record of rDNA research so far prove that the environmental impact of rDNA research is likely to be less than expected in 1977.

## II. The Standard of Review

The Court reviews the decision of an agency that an EIS is not necessary under the deferential "arbitrary or capricious" test, 5 U.S.C. § 706, which essentially means that that the Court cannot "second-guess" the agency unless it has acted unreasonably. *E.g., National Audobon Society v. Hester*, 801 F.2d 405, 407 (D.C.Cir. 1986). The Court must give a hard and thorough look at the evidence presented to it on the record. Nonetheless, the Court thus must uphold scientific evaluations and conclusions by an agency if the decision was a reasonable one, even if there are good—or even, in the Court's opinion, slightly more convincing—arguments made on the other side.

■ With regard to the question of whether an agency has been reasonable in deciding not to create a supplementary EIS for new information or a new development in major federally sponsored action, the Court should consider the likely environmental impact of the new development and the degree of care that the agency appeared to take in evaluating the new devel-

opment and making its decision not to create a supplement to the EIS. *See, e.g., Cuomo v. NRC,* 772 F.2d 972, 975 (D.C.Cir. 1985). Moreover, the Court should determine whether it was reasonable to conclude that the new developments have not increased the likelihood or changed the form of environment impact significantly. If the Court finds that it was unreasonable to conclude that the new developments do not significantly change the likelihoood of environmental impact, it must overturn the agency decision. When there is a debate among scientists as to the environmental impact of new developments, the Court must defer to the agency's decision if its appears to supported by "substantial evidence." *See Association of Data Processing Organizations, Inc. v. Board of Governors,* 745 F.2d 677, 685 (D.C.Cir.1984) (review under the "substantial evidence" standard is essentially equivalent to that under the "arbitrary or capricious" test).

### III. The Plaintiff's Challenges

It is settled that NIH approval of experiments involving rDNA constitute "major federal action" under NEPA and thus is subject to the EIS requirement when appropriate. *FOET v. Heckler,* 756 F.2d 143 (D.C.Cir.1985). The plaintiffs in this case allege that certain research and experimentation approved by NIH in the years after the 1977 EIS have triggered the requirement of an EIS supplement, but that NIH has failed to create such a supplement.

■ An agency may not rest on an EIS if there is significant new information to be gathered that would change the environment evaluation. *See, e.g., Society for Animal Rights v. Schlesinger,* 512 F.2d 915 (D.C.Cir.1975). Moreover, NIH is obligated to create a supplement to an EIS when new scientific developments in a biomedical field make an earlier EIS insufficient to evaluate adequately the environmental impact of the new developments. *See, e.g., FOET v. Heckler,* 756 F.2d 143 (D.C.Cir.1985).

The plaintiffs disagree that the 1977 EIS is legally sufficient under NEPA to cover all current rDNA research conducted under the auspices of NIH since 1977. Specifical-

ly, plaintiffs argue that there are three new areas of research and experimentation that were not evaluated by the 1977 EIS: (1) the ability to clone oncogenes into bacteria using shuttle vectors; (2) the cloning of the HIV (human immunodefiency virus); and (3) the engineering of genetic codes of AIDS (acquired immune deficiency syndrome) into animal species. On each of these three broad points, the Court concludes that it is reasonable to maintain that the new developments are not so significant in their likely impact on the environment that a new EIS is necessary.

### A. Oncogenic Cloning

■ The first area of debate is over the purported new development of the ability to clone oncogenic—i.e., tumor-causing—viruses into bacteria by using shuttle vectors. Plaintiffs' Memo. at 21. Vectors are DNA molecules used to introduce foreign DNA into a cell. The plaintiffs fear that this ability could lead to a situation in which oncogenic viruses entered into *E. coli* could reproduce, causing danger to other organisms.

The defendants argue persuasively, however, that the ability to clone oncogenic viruses using shuttle vectors does not create any greater risk or harm than cloning using other methods. Indeed, in 1978 NIH published an Environmental Assessment (EA) on changes in oncogenic research. Noting that the new Guidelines removed the ban on research involving oncogenic viruses classified as moderated risk, the EA stated that the change would not have a significant environmental impact and that cloning oncogenic viruses posed a "conceivable" but "unlikely" biohazard. The principles of basic molecular biology provide that it is virtually impossible for a viral segment to generate a oncogenic virus. *See* 43 Fed. Reg. 33096, 33099, 33110, 33121–22, app. B, C, D, E, and F. This conclusion, and the decision to remove the ban on research involving oncogenic viruses, resulted from an in-depth analysis that included a series of workshops attended by experts from all

over the world[1], various reviews of the workshop conclusions, examination of the guidelines of other countries, hours of public hearings, and various public and scientific comment. *See* Fed.Reg. 33043–33048.

The new technique of using shuttle vectors is still the use of gene or DNA segments and therefore does not increase the risk beyond that was evaluated carefully by the EA in 1978. The Court concludes that there was substantial evidence and that it was reasonable to conclude that the new oncogenic cloning research does not require a supplementary EIS.

### B. Cloning the HIV Virus

■ The second area of new research and experimentation identified by plaintiffs is the ability to genetically engineer the HIV virus into HeLa cells and other types of cells not normally susceptible to HIV. Because these HeLa cells would for the first time be a host to the HIV virus, the plaintiffs argue, this new development would increase the risk of environmental harm.

The defendants note, however, that the new capabilities do *not* extend the host range of the HIV virus. Making HeLa cell lines—which are human cell lines—susceptible to the HIV virus does not put any new species at greater risk, the defendants point out, because humans are already susceptible to HIV and AIDS. Because the practical effect of the development does not appear to pose any serious additional threat, the Court concludes that it reasonable not to require a supplement to the EIS for this research.

### C. Transgenic Experimentation

■ Finally, the third area of research and experimentation about which the plain-

tiffs allege that the government has failed to provide adequate environmental impact statement concerns the engineering of the genetic code for viruses causing human disease into other animals. This transgenic research, the plaintiffs claim, has the potential for serious harm should these animals enter man's environment. Particularly, the plaintiffs point to current experimentation at NIH in which the AIDS DNA has been placed in mice.

NIH approved the mice/AIDS experimentation pursuant to the NIH Guidelines. NIH concluded that if the experimentation was controlled using the highest safety level under the Guidelines, there would be no chance that any of the mice could escape the contained environment. Singer Declaration at ¶ 7.

The plaintiffs argue that NIH is legally required to prepare a supplementary EIS to set forth and assess the possible environmental impact of the experiment and other similar experiments. NIH is in the process, however, of working on amendments to its Guidelines regarding the use of transgenic animals. As part of the Guideline amendments, NIH is preparing an environmental assessment (EA). The Court concludes that this EA should satisfy the legal requirements of NEPA.

The Court also concludes that NIH is acting reasonably in permitting the mice/AIDS experimentation to go forward while the EA is being prepared. First, the Court notes that although the AIDS virus was discovered after the original NIH EIS was published in 1977, the mere existence of a new disease that is being researched does not mean that the analyses, safeguards, and assessments of previous environmental evaluations are worthless.

---

**1.** One workshop, held in Ascot, England, was attended by experts from several countries, most of whom had no stake in recombinant DNA experiments. The primary purpose of the meeting was to conduct a scientific and techinical analysis of possible risks associated with cloning eukaryotic viral DNA segments in *E. coli* K–12 host vector systems and with the use of eukaryotic viruses as cloning vectors in animal, plant, and insect systems. The experts reached an unequivocal opinion that the risks of

cloning viral DNA in a bacterium like *E. coli* are not greater, and are usually much less, than the risks of handling the parent virus. They also stressed that defective viruses pose little risk of infection when used as vectors for cloning DNA. The results of the Ascot meeting were then reviewed by another group of U.S. virologists who converted them into recommendations for revision of the guidelines. 43 Fed.Reg. 33043, 33046 n. 7.

Second, even if the mice/AIDS research does raise new environmental concerns and problems that have not been addressed satisfactorily to the requirements of NEPA, the Court concludes that the proper legal solution is to await the creation of the EA by NIH, instead of enjoining the mice/AIDS research.

NIH has presented persuasive evidence that mice/AIDS experimentation poses only the smallest possible risk to the environment. Under the highest-level containment pursuant to the NIH Guidelines, the mice are stored in "glove box"—a completely sealed unit with built-in gloves for handling the mice without having to open the box. The mice area is surrounded by a Clorox-filled dunk tank designed to stop the mice. Even if a mouse somehow did escape the unit, it would then have to work its way out of the high-level contained laboratory, which contains mouse traps, and a screen door to enable scientists to examine the area before entering. The defendant states that each of the safety features is inspected once every 10 days.

NIH also has guarded against the harm to humans should the mice somehow escape the laboratory building altogether. The mice have been blinded, to prevent their escape and to put them at a selective disadvantage in the wild. Mice injected with the viral DNA while still in embryo have all died before reaching sexual maturity. Singer Declaration at ¶ 5. Finally, the AIDS virus has not been found in the saliva or the urine of the mice—making further remote the possibility that a mouse biting a human or an escaping mouse could spread the AIDS virus.

In sum, the Court does not subscribe completely to the argument that because the mice are not released to the general environment there is no environmental impact. *See FOET v. Block,* Civ. No. 84–3045 (D.D.C. slip op. April 29, 1986) (concluding that there was no environmental impact to an experiment in which animals were kept in the laboratory), *aff'd sub nom. FOET v. Lyng,* 817 F.2d 882 (D.C.Cir.1987). The Court realizes that the environmental im-

pact of an experiment or research should be judged while considering the *possibility* that the experiment could affect the environment, as well as the expected impact. In the NIH's mice/AIDS experimentation, the Court concludes that the EA currently being created appears to satisfy the requirements of NEPA, and that the proven very low possibility of any environmental impact before the EA is complete justifies not enjoining NIH from continuing to sponsor the research pending the publication of the EA.

The defendants' motion for summary judgment is granted.